ADMANCO, Inc. by Michael S. Polsky, Receiver,
Plaintiff-Respondent,

v.

700 STANTON DRIVE, LLC,
Defendant-Appellant-Petitioner,

M&I Marshall & Ilsley Bank, EBSCO Industries,
Inc. and Alliance Laundry Systems, Inc.,
Garnishees.

Supreme Court

*No. 2007AP2791. Oral argument January 5, 2010.
—Decided July 13, 2010.*

2010 WI 76

(Also reported in 786 N.W.2d 759.)

For the defendant-appellant-petitioner there were briefs by *Valerie L. Bailey-Rihn, Jeffrey O. Davis, Matthew D. Fortney,* and *Quarles & Brady LLP,* Madison, and oral argument by *Valerie L. Bailey-Rihn.*

For the plaintiff-respondent there was a brief by *Kevin L. Keeler, Matthew S. Vignali,* and *Beck, Chaet, Bamberger & Polsky, S.C.,* Milwaukee, and oral argument by *Kevin L. Keeler.*

An amicus curiae brief was filed by *Erin O'Connor* and the *O'Connor Law Offices,* Fox Point, on behalf of the NAIOP Wisconsin Chapter, Inc., Building Owners and Managers Association and Commercial Association of Realtors Wisconsin, Inc.

¶ 1. PATIENCE DRAKE ROGGENSACK, J. This review arises in the context of a Wis. Stat. ch. 128 insolvency proceeding, which proceeding applies to

property of the debtor. Wis. Stat. § 128.08 (2007–08).[1] The receiver, Michael S. Polsky (Polsky), was appointed to administer property of the debtor, Admanco, Inc. (Admanco). In that capacity, Polsky demanded return of proceeds from two standby letters of credit issued by M&I Marshall and Ilsley Bank (M&I Bank) that 700 Stanton Drive, LLC (Stanton) drew down, as well as the cash security deposit made by Admanco that Stanton retained. The circuit court awarded[2] the receiver judgment in the amount of $513,292.66 plus statutory costs and fees. The court of appeals affirmed the circuit court.[3]

¶ 2. Because we conclude that the proceeds of the standby letters of credit were not property of Admanco, they are not property of the debtor's estate subject to the receiver's administration under ch. 128. We also conclude that the "claim" of Wis. Stat. § 128.17(2) is a claim against property of the debtor's estate, not a claim against property of the issuer of the standby letters of credit. And finally, we conclude that the circuit court should have ordered summary judgment denying Polsky's breach of contract claim and granting Stanton's breach of contract claim. Accordingly, we reverse the decision of the court of appeals and remand to the circuit court to dismiss Polsky's suit against

[1] All further references to the Wisconsin Statutes are to the 2007–08 version unless otherwise indicated. Even though Admanco, Inc. filed for receivership in 2004 and the receiver filed this action in 2006, we employ the 2007–08 version of the statutes because there has been no intervening statutory change that affects this decision.

[2] The Honorable Peter L. Grimm of Fond du Lac County presided.

[3] *Admanco, Inc. v. 700 Stanton Drive, LLC*, 2009 WI App 57, 318 Wis. 2d 232, 768 N.W.2d 32.

Stanton, as it relates to the proceeds of the standby letters of credit, and for further proceedings consistent with this decision.[4]

## I. BACKGROUND

¶ 3. The relevant facts of the underlying transactions are straightforward and not in dispute. On March 31, 2004, Stanton and Admanco entered into a sale-leaseback arrangement, wherein Stanton paid Admanco $2.8 million for a building Admanco owned and entered into a 15–year leaseback of the building to Admanco.

¶ 4. The written lease required Admanco to provide Stanton a security deposit of $61,313.66 and to obtain for Stanton's benefit two letters of credit, each in the amount of $375,000. Admanco applied for one of the letters of credit, and Admanco's major shareholders, Edward Bumby and Cristopher Bumby (the Bumbys), applied for the other letter of credit. Both letters of credit, in the combined amount of $750,000, were issued by M&I Bank.

¶ 5. The letters of credit were "irrevocable standby letters of credit" that were payable upon presentation of documents listed on the face of the letters of credit. M&I Bank was fully secured by Admanco's property in the event there was a drawdown on the letters of credit.

¶ 6. Admanco encountered financial difficulties, and on December 30, 2004, Admanco assigned its assets

[4] The record reflects that Polsky has instituted various garnishment actions against Stanton to satisfy the judgment of the circuit court. Therefore, to the extent that those garnishment proceedings have been successful, we require the garnishment proceeds, statutory costs and statutory interest be paid to Stanton.

to Polsky for the benefit of creditors pursuant to Wis. Stat. § 128.05. Also on December 30, 2004, Polsky was appointed as the receiver for Admanco's property pursuant to Wis. Stat. § 128.08.

¶ 7. Admanco failed to make its January 1, 2005 rent payment, and Stanton gave notice of default and the opportunity to cure according to the parties' lease.[5] On January 10, 2005, after Admanco failed to cure, Stanton gave notice that it was accelerating the full amount due under the lease without terminating the lease, citing section 22.2 of the lease. Stanton then drew down the full $750,000 from both letters of credit.[6] Stanton also gave notice that it was retaining Admanco's $61,313.66 security deposit.

¶ 8. As part of the ch. 128 proceedings, and with M&I Bank's approval, Polsky applied for and was given permission from the court to sell Admanco's assets. From the sale of those assets to EBSCO Industries, Inc. (EBSCO Industries),[7] M&I Bank was paid more than $3 million, which included full reimbursement for the $750,000 payment M&I Bank made to Stanton.

¶ 9. Polsky brought suit against Stanton on behalf of the debtor's estate, claiming the estate had the right to recoup $811,313.66. This amount included the $750,000 drawdown on the letters of credit and

---

[5] Admanco-Stanton lease, § 21.2.

[6] Because the letters of credit were secured on March 31, 2004, contemporaneous with Stanton's payment of $2.8 million to Admanco, and the petition that commenced the ch. 128 proceeding was not filed until December 30, 2004, no argument can be made that the letters of credit constituted a preference under Wis. Stat. § 128.07.

[7] Admanco is a division of EBSCO Industries, Inc.

Stanton's retention of the $61,313.66 cash security deposit.[8]

¶ 10. Polsky also sued the Bumbys, seeking $375,000 to reimburse the debtor's estate for the second letter of credit of which the Bumbys were the applicants. The Bumbys reached an agreement with Polsky by paying $267,374.17, and Polsky dismissed them from further collection actions. Polsky continued to proceed against Stanton for the balance on the Bumbys' letter of credit, as well as the full amount of the letter of credit for which Admanco applied.

¶ 11. Both parties moved for summary judgment. The circuit court granted judgment in favor of the debtor's estate and determined that $513,292.66 was due from Stanton. The circuit court's decision turned in large part on Wis. Stat. § 128.17(2), which it concluded limited the amount of rent that Stanton could assess as damages under the Admanco-Stanton lease. The circuit court did not analyze whether the proceeds of the letters of credit were property of the debtor's estate, but simply assumed they were.

¶ 12. Stanton appealed, arguing that the proceeds from the letters of credit were not property of the debtor's estate; that Wis. Stat. § 128.17(2) does not apply to the drawdown of the letters of credit; and that Stanton is a Wis. Stat. § 128.25(1)(e) secured creditor, in regard to the proceeds from the letters of credit. The court of appeals affirmed the circuit court, concluding

---

[8] We agree with the receiver's determination that the $61,313.66 cash security deposit is part of the debtor's estate because it was Admanco's property prior to the commencement of the debtor's ch. 128 proceeding. Accordingly, our discussion relative to the ownership of the proceeds of the letters of credit does not apply to the cash security deposit.

that § 128.17(2) limited Stanton's claim to one month's rent and that Stanton was not a secured creditor under § 128.25(1)(e). *Admanco, Inc. v. 700 Stanton Drive, LLC,* 2009 WI App 57, ¶¶ 1, 22, 318 Wis. 2d 232, 768 N.W.2d 32. The court of appeals did not analyze Stanton's rights under the Stanton-Admanco lease to determine whether Stanton had a contractual right to draw down the entire $750,000 from the letters of credit.

¶ 13. Stanton petitioned for review, which we granted. We now reverse.

## II. DISCUSSION

### A. Standard of Review

¶ 14. This case presents upon cross-motions for summary judgment, wherein the circuit court granted Admanco's motion and denied that of Stanton, which the court of appeals affirmed albeit on a somewhat different basis. We review decisions on summary judgment independently, applying the same standards of review as did the circuit court and the court of appeals. *DeHart v. Wis. Mut. Ins. Co.,* 2007 WI 91, ¶ 7, 302 Wis. 2d 564, 734 N.W.2d 394.

¶ 15. In the course of reviewing these summary judgment motions, we are required to interpret and apply Wisconsin statutes. The interpretation and application of statutes are questions of law that we decide independently of the decisions previously made by other courts, but benefitting from their discussions and analyses. *Richards v. Badger Mut. Ins. Co.,* 2008 WI 52, ¶ 14, 309 Wis. 2d 541, 749 N.W.2d 581. The summary

judgment motions also require us to interpret a written contract, the Admanco-Stanton lease. Interpretation of an unambiguous written contract presents a question of law for our independent review, as well. *See Prent Corp. v. Martek Holdings, Inc.*, 2000 WI App 194, ¶ 10, 238 Wis. 2d 777, 618 N.W.2d 201.

### B. Letter of Credit Principles

¶ 16. Because this review arises from the draw-down of standby letters of credit, it is important to understand the nature of standby letters of credit and their use in commercial settings; the relative rights and obligations of the participants to standby letters of credit; and how the participants may relate to each other at various times.

¶ 17. Letters of credit have been used in commercial transactions for a very long time. John F. Dolan, *The Law of Letters of Credit* ¶ 1.01, 1–2 (rev. ed. 1999). Initially, letters of credit were used to protect a seller in the sale of goods by assuring that the seller received the purchase price. *Id.* at ¶ 1.01, 1–2 n.1. That use has expanded dramatically such that merchants and bankers commonly use letters of credit in areas that were formerly "the domain of secondary guaranties." *Id.*

■

¶ 18. There are two general types of letters of credit: those "that serve the sale of commodities and those that guarantee the performance of an obligation [. We call] the former a 'commercial' [letter of] credit and the latter a 'standby' [letter of] credit." *Id.*

■

¶ 19. Transactions involving letters of credit are governed by Article 5 of the Uniform Commercial Code (U.C.C.), and in Wisconsin by ch. 405 of the statutes,

which is part of Wisconsin's enactment of the U.C.C. Since the adoption of U.C.C. Article 5, governing letters of credit, there has been a significant expansion in the use of letters of credit in various commercial transactions "where they serve to reduce risk of nonperformance under a contract that calls for performance. Generally, [letters of] credit[] in the nonsale setting have come to be known as standby [letters of] credit[]" because they "standby" and perform only in the event that the person primarily liable to perform does not. *Id.* at ¶ 1.04, 1–20, 21. A standby letter of credit is not drawn upon when a transaction proceeds smoothly, with each party performing according to their contractual agreement.

¶ 20. "The linchpin of the letter-of-credit transaction is the unique legal relationship [among the parties]." Douglas G. Baird, *Standby Letters of Credit in Bankruptcy*, 49 U. Chi. L. Rev. 130, 134 (1982). "Professors White and Summers note that a letter of credit is not like other devices creating legal obligations, but rather that a letter of credit is a letter of credit." *Id.* at 134 n.16. One scholar posits that the standby letter of credit arose out of a rule limiting banks from assuming guarantee obligations for third parties, but that the function of a standby letter of credit is essentially that of a guarantor secondarily liable. Richard A. Lord, *The No-Guaranty Rule and the Standby Letter of Credit Controversy*, 96 Banking L.J. 46, 61–62 (1979).

¶ 21. There are three parties to a standby letter of credit: (1) the applicant who requests the letter of credit; (2) the beneficiary to whom payment is due upon the presentation of documents required by the letter of credit; and (3) the issuer who obligates itself to honor the letter of credit by paying up to a stated amount of

money when it is presented with documents the letter of credit requires. Wis. Stat. § 405.102(1)(b), (c) & (i); Wis. Stat. § 405.108.

¶ 22. The obligation of an issuer to pay upon presentation of proper documentation is an obligation independent of any other claim that may exist among the parties to the letter of credit contract. Wis. Stat. § 405.103(4). As *Eakin* explained, "Letters of credit are designed to avoid complex disputes about how much the beneficiaries 'really' [are] owe[d]. The promise and premise are 'pay now, argue later.' " *Eakin v. Cont'l Ill. Nat'l Bank & Trust Co. of Chi.*, 875 F.2d 114, 116 (7th Cir. 1989). This principle of payment upon proper presentation is known as the independence principle. *See* Dolan, *supra* ¶ 17, at ¶ 2.09, 2–46.

¶ 23. Performance under a standby letter of credit amounts to payment and is often referred to as "honoring" the letter of credit. *See Eakin,* 875 F.2d at 116; Wis. Stat. § 405.102(1)(h). Payment is due upon presentation of documents required by the letter of credit because presentation of those documents is a representation that the applicant has not performed on a contractual obligation that is independent of the contract that sets the terms of the letter of credit. Dolan, *supra* ¶ 17, at ¶ 1.04, 1–21; Wis. Stat. § 405.108.

¶ 24. One of the primary purposes of standby letters of credit is to shift the risk of nonpayment and insolvency from the beneficiary of the letter of credit to the issuer of the letter of credit. *Eakin,* 875 F.2d at 116–17 (explaining that "[i]ssuers of letters of credit take the risk of insolvency" and that "[s]tandby letters of credit are especially designed to deal with insolvency");

*Musika v. Arbutus Shopping Ctr. Ltd. P'ship (In re Farm Fresh Supermarkets of M., Inc.)*, 257 B.R. 770, 772 (Bankr. D. Md. 2001) (noting that "a standby letter of credit [] is a distinct type of financing document that is more akin to a guarantee than to the usual letter of credit"); *Duplitronics, Inc. v. Concept Design Elecs. & Mfg., Inc. (In re Duplitronics, Inc.)*, 183 B.R. 1010, 1015 (Bankr. N.D. Ill. 1995) (noting that by issuing a standby letter of credit the "risk of the customer's . . . insolvency or inability to promptly pay has been shifted from the beneficiary to the bank, a party who can better assess that risk and protect itself"); Baird, *supra* ¶ 20, at 144–45.

¶ 25. All parties to a letter of credit benefit from its use. The applicant uses the letter of credit as a financial inducement to the beneficiary of the letter of credit to enter into a business arrangement, such as a long-term lease, that the beneficiary would not enter into without this inducement.[9] The issuer receives a fee for the risk it takes, and usually, it also contracts for its security from the applicant or others, in the event the issuer is required to honor the letter of credit.[10] The beneficiary of a letter of credit obtains the gold standard of payment assurance for commercial transactions. Alan N. Resnick, *Letter of Credit as a Landlord's Protection Against a Tenant's Bankruptcy: Assurance of Payment or False Sense of Security?*, 82 Am. Bankr. L.J. 497 (2008).

---

[9] Letters of credit are generally more cost-effective and flexible than performance bonds or other types of financial guarantees. Beat U. Steiner, *A Letter of Credit Primer for Real Estate Lawyers,* 28 Real Prop. Prob. & Tr. J. 125, 129 (1993).

[10] The letter of credit may be secured by cash deposits, personal guarantees, guarantees of one who is not a party to the letter of credit contract, real estate, personal property, etc.

¶ 26. Letters of credit create a potential obligation for the issuer that is completely independent of the business arrangement for which it was an inducement. Wis. Stat. § 405.103(4); *All Serv. Exportacao, Importacao Comercio, S.A., v. Banco Bamerindus, Do Brazil, S.A., N.Y. Branch,* 921 F.2d 32, 34 (2d Cir. 1990); *Eakin,* 875 F.2d at 116. By shifting the risk of nonpayment in an underlying transaction to a commercial institution such as a bank that is better able to assess the risk of nonpayment, letters of credit serve to encourage and to facilitate commercial transactions. *N. Shore & Cent. Ill. Freight Co. v. Am. Nat'l Bank & Trust Co. of Chi. (In re N. Shore & Cent. Ill. Freight Co.),* 30 B.R. 377, 378 (Bankr. N.D. Ill. 1983); Baird, *supra* ¶ 20, at 131.

¶ 27. To properly protect the independence of a letter of credit, it is necessary to have a clear understanding of the rights of a trustee in bankruptcy or a receiver in insolvency vis-à-vis the beneficiary of a standby letter of credit once a drawdown has occurred. Their rights must accommodate protection of the beneficiary from nonpayment and insolvency, which the independence principle provides. However, the independence principle nevertheless permits a subsequent breach of contract claim by a bankruptcy trustee or receiver, if such claim lies against a beneficiary who draws down a letter of credit in excess of its right to do so. It is with these foundational principles in mind that we proceed to the issues presented in this case.

## C. Summary Judgment

¶ 28. A decision on summary judgment begins with a review of the complaint to determine whether it states a claim; it proceeds to a review of the answer to

determine whether issue has been joined; and finally to a review of the material submitted in support of and in opposition to the motion to determine whether material issues of fact are in dispute. *Jackson Cnty. v. DNR*, 2006 WI 96, ¶ 11, 293 Wis. 2d 497, 717 N.W.2d 713; *Schuster v. Altenberg*, 144 Wis. 2d 223, 228, 424 N.W.2d 159 (1988). Summary judgment may be granted only if no genuine issue of material fact is in dispute. *Jackson Cnty.*, 293 Wis. 2d 497, ¶ 11.

¶ 29. Polsky filed this action to recover what he alleged were excess lease payments to Stanton as evidenced by the proceeds from the letters of credit and the cash security deposit that Stanton held. Specifically, Polsky alleged that "Stanton's drawing down on the letters of credit indicates that Stanton elected to terminate the Lease."[11] According to Polsky, termination of the lease was a necessary precondition to Stanton's right to draw down the letters of credit.[12] Polsky alleged Stanton's drawdown was a "Termination Default."[13] Polsky alleged that as a result of Stanton's termination of the lease, it had no right to offset the proceeds of the letters of credit against damages occurring after the termination of the lease and, in so doing, Stanton breached the terms of the lease.[14] Additionally, Polsky alleged that as a result of Stanton's termination of the lease, Wis. Stat. § 128.17(2) limited Stanton's claim for "unpaid rent, if any, for the period up to April 1, 2005, when the new lease with EBSCO Industries commenced."[15]

---

[11] Compl., ¶ 13.

[12] *Id.*

[13] *Id.*

[14] *Id.*, ¶¶ 13, 19.

[15] *Id.*, ¶ 15.

¶ 30. Stanton answered, alleging the lease terms permitted Stanton to draw down on the letters of credit without terminating the lease, which Stanton affirmatively alleged it did not terminate.[16] Because it did not terminate the lease, Stanton alleged that it was entitled to offset the proceeds of the cash security deposit and the letters of credit against its future actual damages under the lease.[17] Stanton also alleged that limits imposed under Wis. Stat. § 128.17(2) do not apply to its rights under the lease.[18]

¶ 31. We conclude that the complaint and answer join issue, and the documents submitted with the affidavits do not raise issues of material fact. Accordingly, summary judgment is appropriate for Polsky's statutory claim for return of the proceeds paid from the standby letters of credit, his claim for breach of contract and Stanton's defense to his claims, as well as Stanton's claim for damages arising from Admanco's breach of the lease. *See Jackson Cnty.,* 293 Wis. 2d 497, ¶ 11.

## D. Property and Claims under Ch. 128

### 1. Property of the debtor's estate

¶ 32. Polsky was appointed as receiver of Admanco's property. As Wis. Stat. § 128.08 provides, "[t]he court within the proper county may sequestrate the property of a debtor and appoint a receiver therefor." It has long been the law in Wisconsin that § 128.08 "provides for the sequestration of the *property of the debtor.*" *Indus. Comm'n v. Sanitary Baking Co.,* 242 Wis.

---

[16] Answer, ¶ 13.

[17] *Id.,* ¶ 8 (setting forth "Offset Rights").

[18] *Id.,* ¶ 16.

115, 118, 7 N.W.2d 603 (1943) (emphasis added). Stated otherwise, it is only the property of the debtor (Admanco) that is administered by the receiver (Polsky) in this ch. 128 proceeding. The property of others lies outside the debtor's estate.

¶ 33. Polsky contends, and the court of appeals agreed, that the proceeds of the standby letters of credit became subject to administration of the debtor's estate through the application of Wis. Stat. § 128.17(2), when M&I Bank was reimbursed from the estate's property. *Admanco,* 318 Wis. 2d 232, ¶ 29. M&I Bank's reimbursement occurred because M&I Bank had a security interest in the estate's property sufficient to cover Stanton's $750,000 drawdown. Stanton did point out that the *actual* proceeds from the letters of credit were not Admanco's property, and the court of appeals recognized this principle as well. *Id.,* ¶ 34 n.17.

¶ 34. However, rather than analyzing whether the standby letters of credit were improperly drawn down, which could then give rise to a claim for breach of contract against Stanton, the court of appeals took a shortcut. The court of appeals concluded that because M&I Bank was fully secured by property of the debtor's estate, the drawdown on the standby letters of credit must be treated the same as would property of the debtor. *Id.,* ¶ 35.

¶ 35. This shortcut, if upheld, would do violence to what has been the gold standard for security in Wisconsin commercial transactions, which standby letters of credit have provided for many, many years. As the cases that discuss the use of standby letters of credit in commercial transactions explain, standby letters of credit are employed because they shift the risk of nonpayment and insolvency from the beneficiary to the issuer of the letter of credit, who is better able to assess

the risk of nonpayment and insolvency. *See Eakin,* 875 F.2d at 116; *In re Farm Fresh Supermarkets,* 257 B.R. at 772; *In re Duplitronics,* 183 B.R. at 1015.

¶ 36. Under the court of appeals decision, standby letters of credit would no longer shift the risk of nonpayment and insolvency from the beneficiary to the issuer of the letter of credit because the beneficiary of the letter of credit would bear the ultimate loss. Accordingly, the court of appeals decision contravenes the major function of letters of credit. Stated otherwise, under the court of appeals decision, those who entered into commercial transactions with persons of uncertain creditworthiness, assured by a bargained-for letter of credit, would be deprived of the safety provided by the letter of credit that induced them to enter into the contract.[19]

¶ 37. However, standby letters of credit are able to shift the risk of nonpayment and insolvency to the issuer of the letter of credit because the proceeds of letters of credit are not property of the debtor's estate in a bankruptcy or insolvency proceeding. *Willis v. Celotex Corp.,* 978 F.2d 146, 148 n.3 (4th Cir. 1992) (explaining that the proceeds of an irrevocable letter of credit are not property of the bankruptcy estate); *Kellogg v. Blue Quail Energy, Inc.,* 831 F.2d 586, 589 (5th Cir. 1987) (concluding that "[i]t is well established that a letter of credit and the proceeds therefrom are not property of the debtor's estate"); *Wetzel v. Lumbermans Mut. Cas. Co.,* 324 B.R. 333, 340 n.18 (S.D. Ind. 2005) (same); *OHC Liquidation Trust v. Discover Re (In re Oakwood Homes Corp.),* 342 B.R. 59, 66–67 (Bankr. D. Del. 2006) (same); *Sabratek Corp. v. LaSalle Bank, N.A. (In re*

---

[19] The dissent would have had the same result were it the law in Wisconsin.

*Sabratek Corp.),* 257 B.R. 732, 735 (Bankr. D. Del. 2000) (same); *Leisure Dynamics, Inc. v. Cont'l Ill. Nat'l Bank & Trust Co. of Chi. (In re Leisure Dynamics, Inc.),* 33 B.R. 171, 172–73 (Bankr. D. Minn. 1983) (same).[20]

¶ 38. We agree that the proceeds of standby letters of credit are not property of the debtor's estate. Rather, the proceeds are property of the issuer that are paid to the beneficiary upon a proper demand. They never have been property of the debtor.

¶ 39. Furthermore, some courts have opined that honoring a letter of credit has little effect on the unsecured creditors of the debtor's estate because any security the issuer takes in the applicant's property is reserved for the issuer when the letter of credit commences. *In re Sabratek,* 257 B.R. at 735. Therefore, from that point forward, until the letter of credit has expired, the applicant has no right to dispose of that collateral without the permission of the issuer. *Id.*; *see*

---

[20] Many of the cases cited by the dissent, when properly understood, support our reasoning. Dissent, ¶ 84 n.7. *See First Ave. W. Bldg. v. James (In re Onecast Media, Inc.),* 439 F.3d 558, 564 & n.5 (9th Cir. 2006) (explaining that cases such as *Kellogg* are "not apposite" because it was confronted with a claim for breach of contract underlying the letter of credit); *Int'l Fin. Corp. v. Kaiser Grp. Int'l Inc. (In re Kaiser Grp. Int'l Inc.),* 399 F.3d 558, 566–67 (3d Cir. 2005) (finding "compelling" the logic of *Kellogg* and concluding that the collateral securing the letters of credit, not the proceeds of the letter of credit, constituted property of the debtor's estate); *Am. Bank of Martin Cnty. v. Leasing Serv. Corp. (In re Air Conditioning, Inc. of Stuart),* 845 F.2d 293, 296 (11th Cir. 1988) (explaining that "neither a letter of credit nor its proceeds are property of the debtor's estate"; however, "[c]ollateral which has been pledged by the debtor as security for a letter of credit [] is property of the debtor's estate").

*also In re Leisure Dynamics,* 33 B.R. at 172–73; *Page v. First Nat'l Bank of M. (In re Page),* 18 B.R. 713, 715–16 (D.D.C. 1982).

¶ 40. The dissent contends that we misconstrue *Kellogg* and that it actually supports the dissent's position that "the proceeds at issue are property of the [debtor's] estate, by virtue of the estate collateral securing them."[21] This assertion highlights the central flaw at the core of the dissent: it mistakenly conflates the rights of a beneficiary of a letter of credit to the proceeds of the letter of credit with the rights of a secured creditor to an interest in the property of the debtor's estate.

¶ 41. The dissent correctly points out that *Kellogg* concludes that " 'the letter of credit itself and the payments thereunder may not be property of [the] debtor, but the collateral pledged as a security interest for the letter of credit is.' "[22] We do not quarrel with this statement. However, what the dissent mistakenly does next is to conflate the rights of a secured creditor (M&I Bank) to enforce its security interest in the property of the debtor (Admanco) with the rights of the beneficiary of the letter of credit (Stanton) to be paid by M&I Bank, independent of any contract between M&I Bank and Admanco.

¶ 42. An ´example may help to show why the dissent is conflating two separate and distinct property rights. Suppose Admanco had given property of an unnamed third party, instead of its own property, as security for the letters of credit, breached its lease, and assigned its assets for the benefit of creditors; Stanton

[21] Dissent, ¶¶ 86–87.

[22] *Id.,* ¶ 86 (quoting *Kellogg v. Blue Quail Energy, Inc.,* 831 F.2d 586, 590–91 (5th Cir. 1987)).

then drew down the $750,000. Under that scenario, when M&I Bank realizes on its security underlying the letters of credit, there will be no effect on the debtor's estate because only the property of the unnamed third party will be affected. However, in that hypothetical, M&I Bank would be enforcing the same right against collateral and fulfilling the same obligation to honor Stanton's rights to proceeds from the letters of credit as it has in the case now before us.

¶ 43. The right to execute against collateral and the right to draw down proceeds from letters of credit are legally separate and independent of one another. To conclude otherwise would defeat the rights of the beneficiary of a letter of credit, who is entitled to the same security of payment as it would have received if Admanco had not commenced an insolvency proceeding. *See Eakin,* 875 F.2d at 117. In this respect, the issuer of the letters of credit operates like a guarantor of Stanton's rights under the lease. *See In re Farm Fresh Supermarkets,* 257 B.R. at 772.

### 2. Ch. 128 claims

¶ 44. All property administered under ch. 128 was the debtor's property, which becomes the debtor's estate, that is then subject to administration by the receiver. Wis. Stat. § 128.08. The "claims" that are filed in a ch. 128 proceeding are claims to receive a distribution from the debtor's estate. *Indus. Comm'n,* 242 Wis. at 118. For example, Wis. Stat. § 128.14(1) requires creditors "to file their verified *claims* within 3 months from the date of the filing of an assignment or the appointment of a receiver." (Emphasis added.) Such

claims seek payment from the property that comprises the debtor's estate. *See Nickel v. Stoltz (In re Davis Bros. Stone Co.),* 245 Wis. 130, 13 N.W.2d 512 (1944); *Pobreslo v. Guar. Mortg. Corp.,* 210 Wis. 20, 242 N.W. 725 (1932).

██ █

¶ 45.　Wisconsin Stat. § 128.14(2) raises concerns for creditors "not filing *claims* within the time limited [because they] may be precluded from participation in any dividend which may be declared." (Emphasis added.) The "claim" referenced in § 128.14(2) is a claim against the debtor's estate, and the "dividend" that is referenced in § 128.14(2) is a payment from the debtor's estate. *See Calumet Cnty. v. Baumann (In re Calumet Brewing Co.),* 243 Wis. 317, 321, 10 N.W.2d 190 (1943). Wisconsin Stat. § 128.15 addresses "[o]bjections to *claims.*" (Emphasis added.) Again, the "claims" referenced are claims to a distribution from the debtor's estate. *Gelatt v. DeDakis,* 77 Wis. 2d 578, 600–01, 254 N.W.2d 171 (1977).

¶ 46.　"Claims" also are addressed in Wis. Stat. § 128.17(2), the statute upon which the circuit court and the court of appeals relied to preclude Stanton's retention of the proceeds of the letters of credit. *Admanco,* 318 Wis. 2d 232, ¶ 36. Section 128.17 is entitled "[o]rder of distribution," and it provides in relevant part:

(1) The order of distribution *out of the debtor's estate* shall be as follows:

. . .

(g) Debts due to creditors generally, in proportion to the amount of *their claims,* as allowed.

. . .

(2) Debts to become due as well as debts due may be proved, but a *lessor's claim* shall be limited to past due

rent, and to any actual damage caused the lessor by a rejection of the lease on the part of the debtor or by its termination by force of its provisions. The lessor shall be entitled to payment in full, at the rate specified in the lease, for the period of any actual occupancy by the receiver or assignee.

(Emphasis added.)

¶ 47. Wisconsin Stat. § 128.17(2) limits a lessor's claims against property of the debtor's estate. However, it says nothing about a lessor's claims against property that is not property of the debtor's estate. Stated otherwise, ch. 128 applies to claims against the debtor's estate, not to claims against the property of another.

■■

¶ 48. Recognizing that ch. 128 claims are claims to share in the debtor's estate is important because the proceeds of the letters of credit are not property of the debtor's estate. *Kellogg*, 831 F.2d at 589; *supra* ¶¶ 32–37. Therefore, Wis. Stat. § 128.17(2) says nothing about proceeds from letters of credit, which are property of the issuers. The court of appeals did not consider from what property a "claim" under § 128.17(2) was requesting payment. However, the only property in a ch. 128 proceeding is the property of the debtor's estate. Wis. Stat. § 128.08; *Indus. Comm'n,* 242 Wis. at 118. Because the restriction of § 128.17(2) applies only to distributions from the debtor's estate, it is not applicable here.

¶ 49. The court of appeals concluded that Wis. Stat. § 128.17(2) capped Stanton's claim for rent, relying in part on cases such as *Oldden v. Tonto Realty Corp.,* 143 F.2d 916 (2d Cir. 1944) and *Redback Networks, Inc. v. Mayan Networks Corp. (In re Mayan Networks Corp.),* 306 B.R. 295 (B.A.P. 9th Cir. 2004), construing 11 U.S.C. § 502(b)(6)(A) (2006) of the revised federal bankruptcy code. *Admanco,* 318 Wis. 2d 232, ¶¶ 11–13, 24–25,

31–34. However, this provision of the federal bankruptcy code is unlike Wis. Stat. § 128.17(2) and therefore, interpretations of it cannot be used to support applying § 128.17(2) to cap contract damages that are not claims against the debtor's estate.

¶ 50. The revised federal bankruptcy act caps "rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease." 11 U.S.C. § 502(b)(6)(A). It was this provision that *Oldden*[23] and *In re Mayan Networks* interpreted in the context of a federal bankruptcy proceeding, not a state insolvency proceeding as we have here. *Oldden,* 143 F.2d at 917; *In re Mayan Networks,* 306 B.R. at 297–98. While it may be that ch. 128 was modeled on the federal bankruptcy act, it is beyond dispute that when the federal act was revised to include this cap, ch. 128 was not similarly revised. Therefore, the case law interpreting the cap on rent from § 502(b)(6)(A) does not inform our interpretation of Wis. Stat. § 128.17(2).[24]

---

[23] *Oldden v. Tonto Realty Corp.,* 143 F.2d 916 (2d Cir. 1944), interpreted 11 U.S.C. § 502(b)(6)(A)'s predecessor, § 63 sub. a(9), which established a cap of " 'rent reserved by the lease, without acceleration, for the year next succeeding the date of the surrender of the premises to the landlord or the date of reentry of the landlord, whichever first occurs, . . . plus an amount equal to the unpaid rent accrued.' " *Id.* at 917 (quoting § 63 sub. a(9)).

[24] Several other cases cited by the dissent interpret 11 U.S.C. § 502(b)(6)(A), and for the reasons just explained, do not inform our interpretation of Wis. Stat. § 128.17(2). *See* dissent, ¶ 84 n.7 (citing *AMB Prop., L.P. v. Official Creditors for the Estate of AB Liquidating Corp. (In re AB Liquidating Corp.),* 416 F.3d 961, 965 & n.3 (9th Cir. 2005); *In re Connectix Corp.,* 372 B.R. 488 (Bankr. N.D. Cal. 2007)).

### 3. Breach of contract

¶ 51. Even though the proceeds of a letter of credit are not the property of the debtor's estate and the drawdowns on the letters of credit are not claims against the debtor's estate, it does not follow that a receiver can make no claim that the beneficiary drew down more proceeds than it was contractually entitled.

¶ 52. Payment from a standby letter of credit does not negate any suit for breach of contract against the beneficiary of a letter of credit, if such a claim exists. *See First Ave. W. Bldg. v. James (In re Onecast Media, Inc.),* 439 F.3d 558, 564 (9th Cir. 2006) (explaining that a trustee may maintain a claim for breach of contract if the beneficiary breached the contract underlying the letter of credit by a drawdown that exceeded the beneficiary's damages).

¶ 53. A breach of contract claim is a chose in action under Wisconsin law and a property right of the person who holds it. *Burmeister v. Schultz,* 37 Wis. 2d 254, 259, 154 N.W.2d 770 (1967). Accordingly, here, if there were a breach of contract action that would lie against Stanton, that property right would belong to the debtor's estate. *In re Onecast Media,* 439 F.3d at 564. Polsky sought to proceed on such a claim because he sued Stanton for breach of contract.[25] However, neither the circuit court nor the court of appeals ruled on that claim.

¶ 54. Recognizing that the proceeds of a standby letter of credit is not part of the debtor's estate, while permitting a suit on the debtor's behalf against the

[25] Compl., ¶¶ 13, 19; *see supra* ¶ 29.

beneficiary of a standby letter of credit for breach of contract is an important distinction to maintain. That distinction preserves the ability of a standby letter of credit to shift the risk of nonpayment and insolvency to the issuer of the letter of credit, thereby facilitating commercial transactions. However, it also permits a debtor's receiver to collect all of the property of the debtor, including damages arising from breach of contract actions.

¶ 55. Therefore, while the amount of money sought by a receiver subsequent to a drawdown on a standby letter of credit may be the same amount that is proved as damages for breach of contract against a beneficiary, they are not the same property interest and they do not arise in the same way. The proceeds of a letter of credit is property of the issuer of the standby letter of credit. *Kellogg,* 831 F.2d at 589. The damages for breach of contract are property of the debtor because they are payment for the debtor's contract rights. *In re Onecast Media,* 439 F.3d at 564.

¶ 56. Furthermore, distribution from a standby letter of credit arises upon the presentation of documents that the standby letter of credit requires for payment. Nothing more is required. By contrast, damages for breach of contract require the receiver to prove the contract, the breach and the amount of damages that resulted from the breach. Arthur L. Corbin, *Corbin on Contracts* §§ 943–944, at 923–24 (1952). Stated otherwise, a lawsuit for breach of contract in a ch. 128 proceeding requires the same proofs as does a lawsuit for breach of contract outside of such proceeding;

615

payment of damages is not automatic upon a claim of breach of contract. *See Hayes v. Buda,* 323 F.2d 748, 750 (7th Cir. 1963).

¶ 57. Here, Polsky did allege Stanton breached the letter of credit contract, claiming that Stanton collected more money in the drawdown than it had a right to under the Admanco-Stanton lease.[26] Stanton also alleged a claim for breach of contract, claiming that Admanco breached the lease, thereby giving rise to Stanton's contractual remedies under the lease.[27]

¶ 58. Resolution of both Polsky's and Stanton's breach of contract claims depend on the terms of the written Admanco-Stanton lease. The lease was submitted to the circuit court during the motions for summary judgment, as well as being attached to the Complaint.

¶ 59. There is no dispute that Admanco breached the lease by failing to pay the rent due January 1, 2005, and that Admanco did not timely cure that default of its obligations under the lease.[28] Stanton also maintains that Admanco defaulted under the lease by assigning its assets for the benefit of creditors and having a receiver appointed pursuant to Wis. Stat. ch. 128. In that regard, the lease provides in section 21:

21. *EVENTS OF DEFAULT*

21.1 *Bankruptcy of Tenant or Guarantor.* It shall be a default by Tenant under this Lease if either or both of any Guarantor and Tenant *makes an assignment for the benefit of creditors, or files a voluntary petition*

---

[26] Compl., ¶¶ 13, 19.

[27] Answer, ¶ 13; Answer 3, ¶ 8 (setting forth "Offset Rights").

[28] Admanco-Stanton lease, § 21.2.

> *under any state or federal bankruptcy or insolvency law* . . . that is not dismissed within 90 days, . . . or whenever a receiver of Tenant or any Guarantor, as the case may be, or of, or for, the property of Tenant or any Guarantor, as the case may be, shall be appointed, or Tenant or Guarantor, as the case may be, admits it is insolvent or is not able to pay its debts as they mature.

(Emphasis added.)

¶ 60. Admanco assigned its assets to Polsky for the benefit of Admanco's creditors, and Polsky was appointed receiver for Admanco's property. These facts are undisputed. The terms of default under section 21.1 are clearly set out, and the undisputed facts establish that Admanco "ma[de] an assignment for the benefit of creditors" and "file[d] a voluntary petition under [] state . . . insolvency law." As such, Admanco's conduct comes within its provisions. Therefore, as a matter of law, Admanco committed a second event of default under the lease's terms by these actions. *See Prent Corp.*, 238 Wis. 2d 777, ¶ 10.

■■

¶ 61. The Admanco-Stanton lease also provides remedy options for the landlord when the tenant defaults. The remedies available to the landlord are set out in section 22. Here, Stanton stated that it was proceeding under section 22.2(b) of the lease when it terminated Admanco's possession without terminating its lease.[29] Section 22.2 provides in relevant part:

> 22.2 *Landlord's Remedies.* In the event of any default by Tenant under this Lease, Landlord, at its option, . . . may, in addition to all other rights and remedies provided in this Lease, or otherwise at law or in equity: . . . (b) *terminate Tenant's right of posses-*

---

[29] Aff. of Scott Revolinski, Exhibit 8.

*sion of the Premises without terminating this Lease,* provided, however, that Landlord may, whether Landlord elects to proceed under Subsections (a) or (b) above, relet the Premises, or any part thereof for the account of Tenant . . . *If Landlord elects to pursue its rights and remedies under Subsection (b) above, . . . and Landlord fails to relet the Premises, then Tenant shall pay to Landlord the sum of* (x) the projected costs of Landlord's expenses of reletting . . . and (y) *the accelerated amount of Base Rest and Additional Rent due under the Lease for the balance of the Term, discounted to present value at a rate of 6% per annum.*

(Emphasis added.) Stanton gave affirmative written notice that it was not terminating the lease; it was merely terminating Admanco's right of possession.[30] Stanton also gave notice that in an effort to mitigate its damages, it would be reletting part of the premises to EBSCO Industries.[31]

¶ 62. When Stanton terminated Admanco's possession without terminating the lease,[32] the payments for the full term of the lease came due at a discounted rate of 6% per annum.[33] The Base Rent under the lease for the first 12 months was $367,882.00; the Base Rent for the next 12 months was $377,079.05; the Base Rent for the third 12 months was $386,506.03.[34] The Base Rent continued to escalate annually, ending with $519,807.63 due during the final 12 months of the lease.[35] The cumulative amount of the Base Rent payments due under the lease, discounted by 6% per

---

[30] *Id.*

[31] *Id.*

[32] *See generally* Admanco-Stanton lease, § 22.2.

[33] *Id.*, § 22.2(b).

[34] *Id.*, § 2.2.

[35] *Id.*

annum, greatly exceeds Stanton's $750,000 draw down on the standby letters of credit. Therefore, Stanton did not breach the Admanco-Stanton lease when it drew down $750,000 from the standby letters of credit.

¶ 63. Polsky's breach of contract claim alleges that Stanton had no contractual right to $750,000 when it drew down the standby letters of credit because Stanton had terminated the lease.[36] However, as we mentioned above, the documents that Stanton submitted in support of its motion for summary judgment show Stanton provided affirmative, written notice that it was not terminating the lease. Stanton had the contractual right to select this remedy for Admanco's defaults. Therefore, Polsky has not set out facts sufficient to show that Stanton exceeded its rights under the lease when it accelerated the rent due for the term of the lease pursuant to the Admanco-Stanton lease, section 22.2(b). Accordingly, Polsky's breach of contract claim fails, and Stanton's breach of contract claim prevails.

## III. CONCLUSION

¶ 64. Because we conclude that the proceeds of the standby letters of credit were not property of Admanco, they are not property of the debtor's estate subject to the receiver's administration under ch. 128. We also conclude that the "claim" of Wis. Stat. § 128.17(2) is a claim against property of the debtor's estate, not a claim against property of the issuer of the standby letters of credit. And finally, we conclude that the circuit court should have ordered summary judgment denying Polsky's breach of contract claim and granting Stanton's breach of contract claim.

---

[36] Compl., ¶ 13.

¶ 65. Accordingly, we reverse the decision of the court of appeals and remand to the circuit court to dismiss Polsky's suit against Stanton, as it relates to the proceeds of the standby letters of credit, and for further proceedings consistent with this decision.[37]

*By the Court.*—The decision of the court of appeals is reversed, and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

¶ 66. SHIRLEY S. ABRAHAMSON, C.J., and AN-NETTE KINGSLAND ZIEGLER, J., did not participate.

¶ 67. N. PATRICK CROOKS, J. (*dissenting*). Who needs the legislature when we have this majority? Essentially, the majority does not appear to like the cap in Wis. Stat. § 128.17(2) limiting landlord claims for rent in receivership proceedings, so it writes its way around it. In so doing, the majority fails to honor the principles underlying receivership proceedings in Wisconsin and demolishes the utility of § 128.17(2), which is designed to compensate a landlord for loss of rent while preventing a claim for prospective rent so large that it would deplete an estate in receivership to the detriment of unsecured creditors.

¶ 68. The majority does that all in the name of protecting the integrity of all letters of credit. However, the majority's fear that to rule otherwise will destroy the utility of letters of credit is unfounded. The court of appeals' opinion in this matter was narrow and impacted only letters of credit between landlords and

---

[37] We do not address whether Stanton is a secured creditor within the meaning of Wis. Stat. § 128.25(1)(e) because that issue has no bearing on our conclusion that the proceeds of the letters of credit are not property of the debtor's estate.

tenants, and only proceeds exceeding a landlord's allowable claims under chapter 128. As a result of the majority opinion, receivership estates are more likely to be depleted by a landlord that had contracted for all of its future rent, and unsecured creditors in receivership proceedings are more likely to be left twisting in the wind.

¶ 69. Accordingly, I dissent. I agree with the parties, the circuit court, the court of appeals, and numerous federal courts[1] that, in the context of receivership and bankruptcy, the proceeds of the letter of credit here, are secured by property of the estate, and thus are within the receiver's (or bankruptcy trustee's) control. Additionally, in response to the questions asked of this court by the parties, I would conclude, as did the court of appeals, that Stanton is not a secured creditor as defined by Wis. Stat. § 128.25(1)(e), that that conclusion does not offend the independence principle, and that Stanton's claim is limited by the landlord cap in Wis. Stat. § 128.17(2). Hence, I would affirm the court of appeals.

¶ 70. To understand why the majority's approach is misguided, it is important to understand how receivership proceedings operate and the rationale behind the statutory scheme. Wisconsin Stat. ch. 128 governs assignments for the benefit of creditors. "An assignment provides a means of liquidating the assets of a debtor in an orderly and controlled manner." 4 Charles G. Center et al., *Wisconsin Business Advisor Series: Collections & Bankruptcy* § 4.2.16, at 2:21 (2006). The Wisconsin legislature originally adopted chapter 128 in 1937, L. 1937, ch. 431, and modeled it on particular provisions of the federal Bankruptcy Act of

---

[1] *See infra* ¶ 84 n.7 (listing cases).

1898 as it was amended through 1928.[2] *See Capitol Indem. Corp. v. Hoppe (In re Bossell, Van Vechten & Chapman),* 30 Wis. 2d 20, 26, 139 N.W.2d 639 (1966); 4 Center et al., § 4.2.16, at 2:21.

¶ 71. To initiate receivership proceedings under chapter 128, a debtor voluntarily assigns its assets to an assignee who files the assignment and delivers the bond to the circuit court. Wis. Stat. § 128.02; *see Linton v. Schmidt,* 88 Wis. 2d 183, 189, 277 N.W.2d 136 (1979). Thereafter, as Wis. Stat. § 128.05(1) provides, "[t]he court shall . . . order the assignee to administer the debtor's estate pursuant to this chapter, and the assignee shall be vested with the powers of a receiver." *See also* 4 Center et al., § 4.2.16, at 2:21.

¶ 72. Once appointed, a receiver generally has a duty to "act[] for the benefit of the insolvent debtor and all of his creditors." *Candee v. Egan,* 84 Wis. 2d 348, 361, 267 N.W.2d 890 (1978) (citing *Harrigan v. Gilchrist,* 121 Wis. 127, 237, 99 N.W. 909 (1904)). However, given that "[t]he object and purpose of assignment law is to afford an equal distribution of the assignor's estate to all creditors in proportion to their claims," the receiver is "bound to look primarily to the interests of the creditors." *Linton,* 88 Wis. 2d at 198.

---

[2] Although the legislature adopted chapter 128 in 1937, there is little Wisconsin case law or legislative history interpreting chapter 128's provisions. Because of that, courts have often looked to sources interpreting the Bankruptcy Act when interpreting parallel provisions in chapter 128. *See, e.g., In re Delta Group,* 300 B.R. 918, 923–24 (Bankr. E.D. Wis. 2003) (comparing Wis. Stat. ch. 128 provision with similar provision in bankruptcy code); *Capitol Indem. Corp. v. Hoppe (In re Bossell, Van Vechten & Chapman),* 30 Wis. 2d 20, 26–29, 139 N.W.2d 639 (1966) (same).

¶ 73. As for specific duties, the receiver inventories all assets of the estate and lists all of the debtor's creditors. Wis. Stat. § 128.13. Moreover, the receiver is given the title of the debtor to the property and given the right to recover property that the debtor improperly transferred. Wis. Stat. § 128.19(1)-(2). The debtor's creditors have three months from the filing or appointment of the receiver to file claims. Wis. Stat. § 128.14. The receiver then, in accordance with Wis. Stat. § 128.17, distributes the estate assets. The receiver first pays costs of preserving and administering the estate, wages, taxes, and other debts entitled to priority. Wis. Stat. § 128.17(1)(a)-(f). The receiver then pays debts due to general unsecured creditors pro rata "in proportion to the amount of their claims, as allowed." Wis. Stat. § 128.17(1)(g).

¶ 74. In receivership proceedings, landlords' or lessors' claims receive treatment unique from claims of secured and general unsecured creditors. Wis. Stat. § 128.17(2) provides:

> Debts to become due as well as debts due may be proved, but a lessor's claim shall be limited to past due rent, and to any actual damage caused the lessor by a rejection of the lease on the part of the debtor or by its termination by force of its provisions. The lessor shall be entitled to payment in full, at the rate specified in the lease, for the period of any actual occupancy by the receiver or assignee.

In other words, a landlord or lessor is limited to claims for "past due rent," including rent due for the period during which the receiver or assignee occupied the property, and any actual damage caused by the debtor's rejection of the lease or its termination. Although the statute does not expressly state that a landlord or lessor has no claim for future rent, it can be reasonably

inferred from the language "past due rent" and "actual damage" that the statute does not permit a claim for future rent. The parties do not appear to dispute that the statute, if applicable, would limit Stanton's allowable claim. Additionally, the statutory history bears out that interpretation, as explained herein.

¶ 75. As an initial matter, courts have understood the original enactment of the federal Bankruptcy Act of 1898, after which the legislature modeled Wis. Stat. § 128.17(2), to preclude a landlord from recovering future rent because such a claim could not be proved. *See Oldden v. Tonto Realty Corp.*, 143 F.2d 916, 918 (2d Cir. 1944) (listing cases so holding). Although the court in *Oldden* noted that the rule limiting a landlord to past due rent "was often harsh as to the landlord, . . . it did prevent the exhaustion of bankrupt estates for disproportionately large lease claims." *Id.* at 919.

¶ 76. In 1934, Congress amended federal bankruptcy law to permit a landlord to claim past due rent as well as a portion of future rent capped at "the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease."[3] 11 U.S.C. § 502(b)(6). In other words, Congress permitted larger claims for future rent "to compensate the landlord for his loss," yet it still retained a cap under § 502(b)(6) to prevent "a claim so large (based on a long-term lease) as to prevent

---

[3] However, it is worth noting that in Chapter 11 proceedings, "[t]o the extent that a landlord will have a security deposit in excess of the amount of the claim allowed under § 502(b)(6), *the excess will be turned over to the [bankruptcy] trustee.*" 4 *Collier on Bankruptcy,* § 502.03[7][h] (15th ed. rev. 2002) (emphasis added); *see also Oldden v. Tonto Realty Corp.*, 143 F.2d 916, 921 (2d Cir. 1944) (stating that any surplus of security deposit held by a landlord beyond its permitted claim "should go to the trustee for the general creditors").

other general unsecured creditors from recovering a dividend of the estate." *Redback Networks, Inc. v. Mayan Networks Corp. (In re Mayan Networks Corp.),* 306 B.R. 295, 298 (B.A.P. 9th Cir. 2004) (quoting the legislative history of § 502(b)(6) in S. Rep. No. 95–989, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5849; H.R. Rep. No. 95–595, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6309). Notably, the Wisconsin legislature did not follow the lead of Congress and thus made no such change to Wis. Stat. § 128.17(2). Rather, that statute maintains the Bankruptcy Act's pre-1934 limit to claims for past due rent and actual damages only.[4]

---

[4] The majority fails to offer a persuasive explanation of why federal cases such as *Oldden* and *Mayan Networks,* which interpret the cap imposed on landlord claims for future rent in 11 U.S.C. § 502(b)(6)(A), "do not inform" its interpretation of the cap imposed on landlord claims in receivership by Wis. Stat. § 128.17(2). Its reasoning seems to be based on the observation that the federal cap permits a larger landlord claim than does the state cap. Therefore, in the majority's view, analogizing to federal case law interpreting 11 U.S.C. § 502(b)(6) is inappropriate here. *See* majority op., ¶¶ 49–50 & n.24.

The majority, however, stubbornly refuses to acknowledge that the *principle* present in the Bankruptcy Act of 1898—i.e., limiting a landlord's claim for future rent prevents depletion of an estate in insolvency proceedings—necessarily underlies both 11 U.S.C. § 502(b)(6) and Wis. Stat. § 128.17(2). *See Redback Networks, Inc. v. Mayan Networks Corp. (In re Mayan Networks Corp.),* 306 B.R. 295, 298 (B.A.P. 9th Cir. 2004) (noting legislative history of stating that "the purpose of [§ 502(b)(6)] is to compensate the landlord for his loss while not permitting a claim so large (based on a long-term lease) as to prevent other general unsecured creditors from recovering a dividend of the estate") (internal quotation marks omitted). In my view, and in the view of the many federal cases discussed herein, those cases cannot be dismissed as inapplicable. The Wisconsin legislature modeled Wis. Stat. § 128.17(2) after the federal bankruptcy act

¶ 77. Hence, Wis. Stat. § 128.17(2) would limit Stanton to a claim for its past due rent and actual damages only. Given that, the majority endorses an end run, taking the proceeds of the letter of credit out of the receivership based on its conclusion that the proceeds are not property of the estate. Although I agree with the majority's conclusion that chapter 128 limits the receiver's control to property of the debtor's estate, I believe that the majority's conclusion that the proceeds here are not property of the estate is misguided, precisely because these proceeds were secured by property of the estate, as explained below.

¶ 78. The lease between Stanton and Admanco contained a provision with the heading "Security Deposit," which stated that Admanco would provide Stanton with a $61,313.66 cash security deposit[5] and two irrevocable standby letters of credit for $375,000 each "representing security for the performance by Tenant of its rental obligations and certain of Tenant's other obligations hereunder." Both letters of credit were issued by M&I Bank (M&I), designated Stanton as the beneficiary, and stated that M&I would pay Stanton the proceeds from the letters "upon presentation of" docu-

and its purpose of limiting landlord claims for future rent; the later amendment in § 502(b)(6) that increased the amount a landlord may claim comports with that purpose. Simply put, the majority's failure to apply those cases defies logic, reason, and common sense.

[5] Along with its arguments that it was entitled to retain the proceeds from the letters of credit, Stanton also argued to the court of appeals that it was entitled to retain the cash security deposit. The court of appeals rejected that argument to the extent that the security deposit exceeded Stanton's allowable claim for damages. *See Admanco,* 318 Wis. 2d 232, ¶¶ 24–26. Stanton does not renew its argument regarding the security deposit here.

ments stating that Stanton "is entitled to draw upon" the letters. The first letter of credit designated Admanco as the applicant (the Admanco letter) and the second letter designated Admanco's principals, Edward and Cristopher Bumby, as the applicants (the Bumby letter). Importantly, Admanco pledged its assets to M&I to secure Admanco's and the Bumbys' obligations under both letters of credit.

¶ 79. The court of appeals' decision turns on the fact that the proceeds were secured by estate assets and that Stanton and Admanco considered the letters of credit to act as a security deposit on the lease. *Admanco,* 318 Wis. 2d 232, ¶¶ 35–36. The majority calls the court of appeals' reasoning—an approach that the circuit court in this case endorsed and that has support in numerous federal courts—a "shortcut." Majority op., ¶¶ 34–35. In my view, the court of appeals got it right. It followed an approach taken by numerous federal courts. Moreover, that approach, which the Ninth Circuit Bankruptcy Appellate Panel set forth in the *Mayan Networks* case, comports with the principles underlying Wisconsin receivership law.

¶ 80. *Mayan Networks* involved the sublease of a commercial building. The tenant delivered to the landlord both a cash security deposit and a letter of credit secured by the tenant's cash, both of which the sublease referred to as "security" for the "faithful performance by [the tenant] of all of [the tenant's] obligations under this [s]ublease." *In re Mayan Networks,* 306 B.R. at 297. After the tenant filed for Chapter 11 bankruptcy, the landlord drew down the full amount of the letter of credit proceeds and applied the cash security deposit to reduce its allowed claim under the 11 U.S.C. § 502(b)(6) statutory cap. *Id.* The issue was whether the landlord had to apply the letter of credit proceeds toward the

remaining amount of its allowed claim under § 502(b)(6), thus reducing the amount of its unsecured claims. *Id.* at 297–98.

¶ 81. The *Mayan Networks* court first looked to the language and history of § 502(b)(6), noting that the intent behind the statute was that a security deposit must be applied toward a landlord's total claim, which left the question of whether it was to treat the letter of credit like a security deposit for purposes of determining the landlord's claim. The court first invoked the general consensus among bankruptcy courts that letters of credit are not property of the estate. However, it stated,

> *[T]he fact that letters of credit themselves are not property of the estate is a red herring.* There is nothing in [§ 502(b)(6)] or in case law that suggests that the limitation in § 502(b)(6) applies only to amounts that are paid directly from property of the estate. Rather, the appropriate analysis looks to the impact that the draw upon the letter of credit has on property of the estate.

*Id.* at 299 (emphasis added).

¶ 82. Looking to the impact that the landlord's draw on the proceeds had on the property of the estate, the court reasoned that the proceeds secured by property of the estate were essentially a security deposit. *Id.* at 300–01. It concluded that "[t]he draw upon the letter of credit had the same effect on the estate as the forfeiture of a cash security deposit." *Id.* at 301. The court determined that there was further support for that conclusion based on the facts that the sublease described the letter of credit as "security" for the sublease and that the letter of credit was to be returned to the tenant if the tenant had met all of its obligations under the sublease. *Id.* at 297, 301. Accordingly, the

proceeds of the letter of credit were to be applied to the landlord's allowable claim as limited by 11 U.S.C. § 502(b)(6).

¶ 83. Following that reasoning, just as trustees in bankruptcy[6] may seek the return of a security deposit to the extent that the amount exceeds the debtor's satisfied obligation, bankruptcy courts have held that a trustee in bankruptcy is entitled to seek proceeds from a letter of credit exceeding the debtor's obligation to the creditor, to the extent that those proceeds are secured by estate assets. *See, e.g., First Avenue West Building, LLC v. James (In re Onecast Media, Inc.),* 439 F.3d 558, 564 (9th Cir. 2006); *AMB Property L.P. v. Official Creditors (In re AB Liquidating Corp.),* 416 F.3d 961, 963 (9th Cir. 2005); *S-Tran Holdings, Inc. v. Protective Ins. Co. (In re S-Tran Holdings, Inc.),* 414 B.R. 28, 35 (Bankr. D. Del. 2009) (debtors may seek proceeds from letters of credit exceeding their obligation); *see also Two Trees v. Builders Transport, Inc. (In re Builders Transport, Inc.),* 471 F.3d 1178, 1187 (11th Cir. 2006) (a letter of credit beneficiary had a duty to return to the debtor excess proceeds not used to secure the debtor's obligation).

¶ 84. I am persuaded that the approach taken by the court in *Mayan Networks,* and numerous other federal courts,[7] supports the conclusion that letter of

---

[6] A receiver in a chapter 128 proceeding has responsibilities and obligations similar to those of a trustee in bankruptcy. *Compare* Wis. Stat. §§ 128.13, 128.14, and 128.17 (describing receiver's duties in state receivership proceedings), *with* 11 U.S.C. §§ 704, 1106 (listing duties of a trustee in federal Chapter 7 and Chapter 11 bankruptcy proceedings).

[7] Before the Ninth Circuit Bankruptcy Appellate Panel issued *Mayan Networks,* several other courts had observed that collateral securing letter of credit proceeds are property of the

credit proceeds secured by estate collateral are property of the estate and thus are subject to the receiver's control in a chapter 128 proceeding. The approach that a beneficiary may not retain standby letter of credit proceeds that are secured by estate assets, to the extent that those secured proceeds exceed the limit on a landlord's or lessor's claimed damages in chapter 128, comports with the clear legislative intent that a landlord is entitled to unpaid rent through the date of the receivership petition. *See* Wis. Stat. § 128.17(2). It also comports with a receiver's duty to act for the benefit of the creditors and to collect and inventory the property of the estate. *See* Wis. Stat. § 128.13 (the receiver has a duty to inventory the property of estate); § 128.19(2)

estate. *See Kellogg v. Blue Quail Energy, Inc. (In re Compton Corp.),* 831 F.2d 586, 590–91 (5th Cir. 1987); *see also American Bank v. Leasing Service Corp. (In re Air Conditioning, Inc.),* 845 F.2d 293, 296 (11th Cir. 1988). Others held that letter of credit proceeds acting as a security deposit are subject to the bankruptcy proceedings. *Solow v. PPI Enters., Inc. (In re PPI Enterprises* (U.S.), Inc.), 324 F.3d 197, 210 (3d Cir. 2003). Since *Mayan Networks,* multiple other courts have adopted its framework recognizing that proceeds of a letter of credit are property of the estate when they are secured by estate collateral. *See, e.g., AMB Prop., L.P. v. Official Creditors for the Estate of AB Liquidating (In re AB Liquidating Corp.),* 416 F.3d 961, 965 & n.3 (9th Cir. 2005); *Int'l Fin. Corp. v. Kaiser Group Int'l Inc. (In re Kaiser Group Int'l, Inc.),* 399 F.3d 558, 566 (3d Cir. 2005); *In re Connectix Corp,* 372 B.R. 488, 496 (Bankr. N.D. Cal. 2007); *see also First Avenue West Building L.L.C. v. James (In re Onecast Media, Inc.),* 439 F.3d 558 (9th Cir. 2006) (holding that a trustee's interest in letter of credit proceeds acting as a security deposit is property of the estate); *cf. S-Tran Holdings, Inc. v. Protective Ins. Co. (In re S-Tran Holdings, Inc.),* 414 B.R. 28, 33–34 (Bankr. D. Del. 2009) (holding that because proceeds of a letter of credit were not secured by estate collateral, the proceeds were not property of the estate).

(the receiver has authority to avoid wrongful transfers of property); *Linton,* 88 Wis. 2d at 198 (the receiver is "bound to look primarily to the interests of the creditors"). Moreover, that approach is consistent with the rationale that the limits in Wis. Stat. § 128.17(2) prevent a landlord or lessor from asserting a claim against the estate "so large as to prevent other general unsecured creditors from receiving a dividend." *Waldschmidt v. Appleton Inv. Co. (In re Zienel Furniture, Inc.),* 13 B.R. 264, 266 (Bankr. E.D. Wis. 1981); *cf. EOP v. Faulkner (In re Stonebridge Techs., Inc.),* 430 F.3d 260, 268–69 (5th Cir. 2005) (observing that the federal statutory cap on landlord claims "prevents a lessor who files a claim against the estate from reaping an unfair share of the bankruptcy estate over the remaining pool of unsecured creditors").

¶ 85. Yet the majority eats up the "red herring" discussed in *Mayan Networks*—hook, line, and sinker. Rather than focus on the effect that the draw on the letter of credit has on the estate in receivership and its impact on the other creditors, the majority declares that the proceeds are not property of the estate, period, on the basis of a handful of largely distinguishable cases.

¶ 86. For example, the majority seizes upon language in *Kellogg v. Blue Quail Energy, Inc. (In re Compton Corp.),* 831 F.2d 586, 589 (5th Cir. 1987), stating that a letter of credit and its proceeds are not property of the estate. *See* majority op., ¶¶ 37, 48. However, the court in that case goes on to state, "When a debtor pledges its assets to secure a letter of credit, a transfer of debtor's property has occurred under the provisions of 11 U.S.C. § 547. . . . Overall, the letter of credit itself and the payments thereunder may not be property of debtor, *but the collateral pledged as a*

*security interest for the letter of credit is." In re Compton Corp.,* 831 F.2d at 590–91 (emphasis added). Other cases invoked by the majority, upon close examination, likewise do not clearly appear to support its proposition concerning the property of the estate.[8]

¶ 87. Despite the majority's claim that I am conflating the rights of a beneficiary of a letter of credit with the rights of a secured creditor to an interest in property of the debtor's estate, I do no such thing. Rather, the majority uses such a claim to avoid the question of whether Stanton is a secured creditor. Because the proceeds at issue are property of the estate, by virtue of the estate collateral securing them, Stanton's lease claim is within the receivership. Which leads to the primary question presented to us by the parties themselves: Is Stanton a secured creditor, as defined by Wis. Stat. § 128.25(1)(e), and therefore entitled to retain the letter of credit proceeds? Because I would conclude—like the parties, the circuit court, the court of appeals, and numerous federal courts—that

---

[8] For example, the court in *Willis v. Celotex Corp.,* 978 F.2d 146 (4th Cir. 1992) addressed an issue concerning a bankruptcy court's authority to enjoin execution on supersedeas bonds. Its discussion of proceeds of a letter of credit, which was not at issue in the case, appears to be dicta. *Id.* at 148 n.3. *See also Wetzel v. Lumbermans Mut. Cas.* Co., 324 B.R. 333, 340 n.18 (S.D. Ind. 2005) (briefly discussing a letter of credit not at issue in a case concerned with insurance policy proceeds). In addition, the parties in *Leisure Dynamics, Inc. v. Continental Ill. Nat'l Bank & Trust Co.,* 33 B.R. 171, 172–73 (Bankr. D. Minn. 1983), were seeking an injunction of the draw-down of the letter of credit; moreover, whether that letter was secured by property of the estate is not clear. *See also Sabratek Corp. v. LaSalle Bank, N.A.,* 257 B.R. 732, 735 (Bankr. D. Del. 2000) (discussing issue of whether to uphold injunction on honoring letter of credit with no discussion of whether it was secured by estate collateral).

secured proceeds from a letter of credit are property of the estate, the issue of whether Stanton is a secured creditor is important.

¶ 88. Secured creditors, as compared to unsecured creditors (and, for that matter, secured creditors under federal Chapter 11 proceedings), have the ability to show some strength in receivership proceedings because secured creditors cannot be compelled to participate in receivership proceedings or have their security taken away without their consent. *Wis. Brick & Block Corp. v. Vogel,* 54 Wis. 2d 321, 325–26, 195 N.W.2d 664 (1972). Wisconsin Stat. § 128.25(1)(e) defines a secured creditor, in pertinent part, as

> a creditor who has either legal or equitable security for his or her debt upon any property of the insolvent debtor of a nature to be liquidated and distributed in a liquidation proceeding, or a creditor to whom is owed a debt for which such security is possessed by some endorser, surety, or other person secondarily liable.

Accordingly, creditors who do not fit within that definition and who have timely filed claims that are not otherwise entitled to priority under § 128.17(1) are placed within the pool of general unsecured creditors.

¶ 89. I am satisfied that Stanton is not a secured creditor under the circumstances presented in the case before us. I strongly endorse the following conclusions made by the court of appeals, that, (1) "M&I, as the issuer of a standby letter of credit, was not 'secondarily liable' for Admanco's contractual obligations with Stanton," *Admanco,* 318 Wis. 2d 232, ¶ 19; (2) "the letter of credit gave rise to a primary independent obligation of M&I to Stanton, and not that of a guarantor or one who is secondarily liable for Admanco's obligations," *id.,* ¶ 20; and (3) "M&I was not secondarily liable for

Admanco's nonperformance under the lease—nor was it a surety. We reject Stanton's contention that it meets the definition of a secured creditor under Wis. Stat. § 128.25(1)(e)." *Id.*, ¶ 22. I also observe, as did the court of appeals, that Stanton has failed to identify a single case holding that a beneficiary of a letter of credit is a secured creditor.[9] *Id.*, ¶ 21 n.14. Additionally, I, like the court of appeals, am satisfied that the independence principle is not compromised by the conclusion that Stanton is not a secured creditor.

¶ 90. Because it is not a secured creditor, I would hold that Stanton is subject to the landlord cap in Wis. Stat. § 128.17(2). Here, looking at the "impact that the draw upon the letter of credit has on property of the estate," *Mayan Networks,* 306 B.R. at 299, I am satisfied that the proceeds of both the Admanco and Bumby letters of credit may be treated properly as a security deposit for purposes of the chapter 128 proceeding. Like the tenant and landlord in *Mayan Networks,* Admanco and Stanton appear to have agreed that the letters of credit functioned as a security deposit. In the lease, provisions for delivery of those letters appeared in a section entitled "Security Deposit" and the lease designated the letters as "representing *security* for the performance by Tenant of its rental obligations and certain of Tenant's other obligations hereunder." (Emphasis added.) The proceeds were secured by assets of the estate. Moreover, the lease provided that the letters of credit were to terminate upon Admanco's satisfactory

---

[9] In contrast, in the context of federal bankruptcy proceedings, the Second Circuit Court of Appeals has held that a beneficiary of a letter of credit is not a secured creditor. *See New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc.),* 351 F.3d 86, 91 (2d Cir. 2003).

completion of the lease. Those factors lead me to the same conclusion reached by the court of appeals: The proceeds of the letters of credit here operate as a security deposit. Accordingly, Stanton must return any proceeds in excess of its allowable claim, which in this case is $30,656.83: the past due rent for January 2005 at the rate specified in the lease.[10]

¶ 91. In summary, I would affirm the court of appeals' well-reasoned, narrow, and firmly supported opinion. As that court correctly stated:

> This approach recognizes the reality that a letter of credit with a related reimbursement agreement secured by the debtor's assets could overwhelm the estate to the detriment of other creditors and faithfully implements the limit on a landlord's claim set forth in ch. 128.

*Admanco,* 318 Wis. 2d 232, ¶ 36.

¶ 92. The majority's claim that this approach does "violence" to letters of credit is nothing more than a cry of wolf. First, the court of appeals' approach has no impact on the many letters of credit that are not between a landlord or lessor and tenant. The court of appeals' holding was limited to enabling a receiver to disgorge proceeds only to the extent that those proceeds operate like a security deposit and deplete the estate assets in excess of the beneficiary's allowed claim. Landlords or lessors comprise the only category of

---

[10] The receiver remained in possession of the leased premises for only the month of January 2005, at which point he sold Admanco's assets to another entity, EBSCO. At that point, EBSCO occupied the premises and took over the lease obligations for February and March of that year. On April 1, 2005, a new lease between EBSCO and Stanton went into effect. Thus, under Wis. Stat. § 128.17(2), Stanton's allowable claim was limited to the past due rent for January 2005.

creditors whose claim has a statutory cap in chapter 128. If a beneficiary of a letter of credit who is not a landlord or lessor draws on a letter of credit for its full, authorized amount, there is no cap to apply to that amount under chapter 128.

¶ 93. Second, letters of credit under the court of appeals' approach will continue to effectuate their purpose of shifting the risk of nonpayment of *the amount to which the beneficiary is entitled* to the issuer. The majority's arguments to the contrary are premised on the proposition that the beneficiary here, Stanton, is entitled to the full amount of the letter of credit proceeds. For a beneficiary in Stanton's position and under the circumstances here, however, Wis. Stat. § 128.17(2) operates to limit the amount to which Stanton is entitled. The court of appeals properly applied that statute and permitted Stanton to retain the full amount of rent due as proscribed by § 128.17(2). Thus, Stanton effectively shifted the risk of nonpayment of *that amount* to the issuer. In short, all the court of appeals is doing here is applying the statute; it is not affecting the risk-shifting benefit that is central to letters of credit.

¶ 94. Third, this approach honors the many other benefits that letters of credit convey. Here, for example, the letters of credit provided Stanton with the benefit of being fully compensated for its past-due rent. Had Stanton proved actual damages based on a rejection of the lease, it could have also retained, in full, those amounts. By drawing down on the letters of credit, Stanton was reimbursed for its claim well before other creditors and, moreover, before the unsecured creditors, who will now, at best, receive only a pro rata proportion of the liquidation proceeds. Additionally, Stanton has had the benefit of holding the proceeds over the several

years that this litigation took place. *See In re Builders Transport, Inc.*, 471 F.3d at 1186 (" '[T]he letter of credit serves, among other things, to shift the burden of litigation. . . . [The] beneficiary of the letter of credit holds the stake during the litigation.' ") (quoting *Resolution Trust Corp. v. United Trust Fund, Inc.*, 57 F.3d 1025, 1034–35 (11th Cir. 1995)).

¶ 95. Aside from retaining those benefits, Stanton's predicament coming out of these proceedings is not nearly as dire[11] as it or the majority would have us believe. As an initial matter, the court of appeals awarded Stanton its past due rent for January 2005. Stanton indicated that it would realize income from the property based on the lease it negotiated with EBSCO, between $4,300 and $4,700 per month through July 2009. Further, Stanton remains in possession of the rental property and can continue to realize an income stream from it. In fact, Stanton projected that it would receive rent of approximately $19,400 per month from at least one other tenant from March 2006 through February 2013. While I acknowledge that Stanton did not recover the full amount of its investment expectations out of its underlying contract with Admanco, I do not believe that the letters of credit under these circumstances operate to insulate Stanton from the risks inherent in such business transactions.

---

[11] For example, in an exhibit accompanying its motion for summary judgment, Stanton alleged that it stood to lose approximately $4,275,000 in base rent. However, that calculation was based on the worst-case scenario that it would have at least one vacancy in the property through March 2019 and no tenants in the building from March 2013 through March 2019. Given that Stanton has been successful at finding other tenants for the property despite its difficulties with Admanco, that worst-case scenario seems improbable.

¶ 96. As noted previously, indeed, it is the majority's approach that is likely to result in considerable mischief, since that approach ignores the framework that the legislature established in Wis. Stat. § 128.17(2) to protect and treat fairly unsecured creditors in receivership proceedings. Rather, following the majority's reasoning, landlords or lessors could tiptoe around the protections in § 128.17(2) to deplete estate assets to the detriment of unsecured creditors.

¶ 97. Is the landlord cap in Wis. Stat. § 128.17(2) fair? Several courts have observed that limiting a landlord to past due rent and actual damages in receivership proceedings might not provide them adequate compensation. *See Oldden,* 143 F.2d at 919; *Admanco,* 318 Wis. 2d 232, ¶ 36 n.20 ("We acknowledge Stanton's contention that this is a harsh result[.]"); *see generally In re Bossell, Van Vechten & Chapman,* 30 Wis. 2d at 29 (observing "the inadequacy of [Wisconsin]'s insolvency law" compared to federal law). But the question of whether the cap is fair is clearly a question for the legislature, and not in our province. *See Holtzman v. Knott,* 193 Wis. 2d 649, 711, 533 N.W.2d 419 (1995) (Steinmetz, J., concurring in part & dissenting in part) ("A state court functions at its lowest ebb of legitimacy when it . . . legislates from the bench, usurping power from the appropriate legislative body and forcing the moral views of a small, relatively unaccountable group of judges upon all those living in the state."); *Wagner Mobil, Inc. v. City of Madison,* 190 Wis. 2d 585, 594, 527 N.W.2d 301 (1995) ("[I]t is not the function of this court to usurp the role of the legislature."). Those courts criticizing the limits imposed on landlord claims appropriately resisted fashioning a convenient work-around of the law. Here, I am disappointed in the majority's failure to exercise such restraint.

¶ 98. For the foregoing reasons, I respectfully dissent.

¶ 99. I am authorized to state that Justice ANN WALSH BRADLEY joins this dissent.